NO. COA13-1287

NORTH CAROLINA COURT OF APPEALS

Filed:  7 October 2014

GREEN TREE SERVICING LLC,
     Plaintiff


v.                                      Robeson County
                                        No. 12 CVS 3092


JIMMY LOCKLEAR and TRUDY LOCKLEAR,
     Defendants


Appeal by defendants from orders entered 23 April 2013 and 5 August 2013 by Judge Thomas H. Lock in Robeson County Superior Court.  Heard in the Court of Appeals 4 March 2014.

> *Jordan Price Wall Gray Jones & Carlton, by Paul T. Flick and Lori P. Jones, for Plaintiff.*
>
> *The Law Office of Benjamin D. Busch, PLLC, by Benjamin D. Busch, for Defendants.*


ERVIN, Judge.


Defendants Jimmie and Trudy Locklear appeal from orders dismissing the counterclaims that they had attempted to assert against Plaintiff and denying their motion seeking to have the order dismissing their counterclaims set aside.[1]  On appeal,

---

[1]Although the notice of appeal that Defendants filed made reference to both of the orders mentioned in the text of this opinion, Defendants have not, as Plaintiff correctly notes, made any argument challenging the denial of their motion for a new trial.  As such, the validity of the trial court's order denying Defendant's motion for a new trial is not properly before us.

Defendants contend that they have standing to pursue their claims under the North Carolina Debt Collection Act on the grounds that they occupy the status of "consumers" as that term is used in the relevant statutory provisions. After careful consideration of Defendants' challenge to the trial court's order in light of the record and the applicable law, we conclude that the trial court's order should be reversed and that this case should be remanded to the Robeson County Superior Court for further proceedings not inconsistent with this opinion.

## I. Factual Background

## A. Substantive Facts[2]

On 28 February 1998, Marvin and Mertice Locklear executed a Manufactured Home Retail Installment Contract and Security Agreement under which they purchased a manufactured home from Ted Parker Home Sales, Inc. According to the provisions of the contract between the parties, Ted Parker was authorized to repossess the manufactured home in the event that any act constituting a default as defined in the agreement occurred, including any failure to make the required monthly payments in a

---

[2]The facts set forth in the text of this opinion are derived from an examination of the allegations set out in Defendants' amended counterclaim as compared to the allegations contained in their original pleading. *See Hughes v. Anchor Enters., Inc.*, 245 N.C. 131, 135, 95 S.E.2d 577, 581 (1956) (holding that, "[w]hile the excerpt from the original complaint was competent as evidence, as a pleading it was superseded by the amended complaint").

timely manner. Subsequently, Ted Parker assigned its rights under the contract to a pool serviced by Plaintiff.

By November 2004, Marvin and Mertice Locklear had both died, with Mertice Locklear having survived Marvin Locklear by approximately five years. Defendant Jimmie Locklear received a partial interest in the manufactured home that Marvin and Mertice Locklear had purchased from Ted Parker by virtue of the residuary clause contained in Mertice Locklear's will. Although Mertice Locklear's will was admitted to probate, the estate administration process was never completed. On 31 October 2012, Defendant Jimmie Locklear qualified as the collector of Mertice Locklear's estate.

Defendants took possession of the manufactured home used to secure the original debt in 2004 and used it as their principal residence. Although Plaintiff was aware that Defendants had begun to occupy the manufactured home, it did not provide Defendants with an opportunity to assume the underlying debt or take any other action to make Defendants liable on the obligation created under the original contract between Marvin and Mertice Locklear and Ted Parker and knew that Defendants, as compared to Mertice Locklear's estate, were not personally obligated to make the payments required under the original contract. As a result, the monthly statements that Plaintiff

sent to the residence were addressed to "Mertice Locklear C/O Jim and Trudy Locklear."

On or about 12 September 2011, Plaintiff sent Defendants a document discussing a deferral of the monthly payments required under the original agreement that included language to the effect that the document had been transmitted to Defendants as part of "an attempt to collect a debt." After entering into a deferral agreement with Plaintiff, Defendants made the required payments prior to the payment applicable to January 2012 in a timely manner.

On or about 12 June 2012, an agent of Plaintiff called Defendant Jimmie Locklear on his cell phone during work hours despite the fact that Plaintiff had previously been advised not to attempt to contact Defendant Jimmie Locklear while he was at work. Instead of answering this phone call, Defendant Jimmie Locklear immediately terminated the call in compliance with his employer's strict prohibition against engaging in cell phone conversations during work hours. As a result, Plaintiff's agent called Defendant Jimmie Locklear again and left him a message to the effect that Defendant Jimmie Locklear had "just hung up on your account manager," that "[i]t's probably not going to go well" for Defendant Jimmie Locklear, and that Defendant Jimmie Locklear should expect to receive a legal notice in the mail.

Although Defendant Trudy Locklear called Plaintiff's agent and informed him that she would be willing to make two payments of $1,000 each by a certain date in order to bring the payments required under the original purchase contract current, Plaintiff's agent responded by telling Defendant Trudy Locklear that Defendants would need to make the required payments before the date that Defendant Trudy Locklear had mentioned and suggested that she pawn her jewelry and lawnmower in order to make the required payment. As a result, Defendant Trudy Locklear borrowed money from an unknown source or sources and used the money that she borrowed on this occasion to send a payment to Plaintiff on 15 June 2012.

Subsequently, Defendant Trudy Locklear called Plaintiff to confirm that the payment that she had made had been received and was told that Defendants had been granted a deferral for June and July, so that their next payment was not due until 5 August 2012. In spite of this understanding, Plaintiff sent a letter to Defendants on or about 18 June 2012 indicating that Plaintiff had begun to take the steps necessary to obtain possession of the collateral, with this letter containing the statement that the "communication [was] from a debt collector" and represented an "attempt to collect a debt."

On 20 July 2012, another of Plaintiff's agents told Defendant Trudy Locklear that the oral agreement that she had made with Plaintiff in June 2012 had not been entered into Plaintiff's recordkeeping system, that there would be no deferral of the June and July payments, and that the overdue payments were due immediately. Although Defendant Trudy Locklear offered to pay $1,000 for the months of September and October, her offer was rejected. Instead, Plaintiff's agent asked Defendant Trudy Locklear where her husband's money was going. In response to Defendant Trudy Locklear's assertion that Defendants had other financial obligations in addition to those associated with the manufactured home that Marvin and Mertice Locklear had purchased from Ted Parker, Plaintiff's agent suggested that Defendants defer payments on their van in order to ensure that Plaintiff received payment.

On 24 July 2012, Defendant Trudy Locklear spoke with another of Plaintiff's agents, who asked her, in response to Defendant Trudy Locklear's inquiry concerning the amount of time that would be available before Defendants had to vacate the manufactured home, "What are you going to do, live in your van?" After making that statement, Plaintiff's agent hung up on Defendant Trudy Locklear. Subsequently, another of Plaintiff's agents called Defendant Trudy Locklear and stated that

Defendants would not be forced to vacate the manufactured home in the event that the required monthly payment was automatically drafted from their bank account. In response to Defendant Trudy Locklear's comment that Defendants' account did not contain sufficient funds to support the making of the required payments, Plaintiff's agent stated that Plaintiff would refund the resulting overdraft fee as long as a draft was scheduled. Although Defendant Trudy Locklear agreed to enter into the proposed arrangement based upon her belief that Defendants would be forced to vacate the manufactured home in the event that she acted otherwise, Defendants later closed the account in question before any draft was actually made against that account.

On or about 30 August 2012, Defendants notified Plaintiff that they were represented by counsel. On 12 September 2012, Plaintiff contacted counsel for Defendants and agreed to stop contacting Defendants by telephone. Even so, Plaintiff's agents contacted Defendant Jimmie Locklear on or about 26 November 2012 using a work number that he had requested that Plaintiff refrain from using. In the course of the ensuing conversation, Plaintiff's agent indicated that Plaintiff was attempting to collect a debt. The same agent contacted Defendant Trudy Locklear on the same date for the same purpose.

## B. Procedural Facts

On 7 November 2012, Plaintiff filed a complaint against Defendants seeking to recover the manufactured home and certain of its contents based upon the fact that required payments against the underlying debt had not been made. On 4 December 2012, Defendants filed a responsive pleading in which they responded to the material allegations contained in Plaintiff's complaint, moved to dismiss Plaintiff's complaint, and asserted a number of counterclaims against Plaintiff, including claims based upon alleged violations of the North Carolina Debt Collection Act and the equivalent provisions of federal law.

On 22 January 2013, the trial court entered an order denying Defendants' dismissal motion. On 29 January 2013, Plaintiff filed a motion to dismiss Defendants' counterclaims. On 4 March 2013, Defendants filed a response to Plaintiff's dismissal motion. On 18 March 2013, Defendants filed an amended counterclaim that sought relief from Plaintiff on the same essential basis set forth in their original responsive pleading. On 22 April 2013, Plaintiff filed a motion seeking the entry of a final judgment in its favor with respect to the repossession claim asserted in its complaint. On 23 April 2013, the trial court entered an order dismissing Defendants' counterclaims.

On 2 May 2013, Defendants filed a motion seeking the entry of an order setting aside the order dismissing their

counterclaims.  On 20 May 2013, the trial court entered a final judgment awarding Plaintiff possession of the manufactured home. Defendants' motion to set aside the order dismissing their counterclaims was denied by the trial court on 5 August 2013. Defendants noted an appeal to this Court from the trial court's orders dismissing their counterclaims and denying their motion to set aside the order dismissing their counterclaims.[3]

## II. Legal Analysis

In their brief, Defendants argue that the trial court erred by granting Plaintiff's motion to dismiss their counterclaims, a decision that was predicated on the theory that Defendants were not "consumers" for purposes of the North Carolina Debt Collection Act.  In support of this contention, Defendants argue that the plain language of the statute necessitates a conclusion that individuals, like themselves, who are alleged by a debt collector to be liable for a debt and have a sufficient connection to the underlying obligation have "consumer" status for purposes of the North Carolina Debt Collection Act.  We find Defendant's argument to be persuasive.

## A. Standard of Review

[3]As a result of their failure to advance any argument challenging the dismissal of the claims that they had asserted against Plaintiff under the federal Fair Debt Collection Practices Act, Defendants have abandoned any claims that they originally asserted under federal law.

We have previously discussed the standard of review utilized in the course of reviewing orders addressing standing-related issues in *Slaughter v. Swicegood*, 162 N.C. App. 457, 463-64, 591 S.E.2d 577, 582 (2004), in which we stated that:

> [t]he North Carolina Rules of Civil Procedure require that "every claim shall be prosecuted in the name of the real party in interest." [N.C. Gen. Stat.] § 1A-1, Rule 17(a) (2003). "A real party in interest is 'a party who is benefited or injured by the judgment in the case' and who by substantive law has the legal right to enforce the claim in question." *Carolina First Nat'l Bank v. Douglas Gallery of Homes*, 68 N.C. App. 246, 249, 314 S.E.2d 801, 802 (1984) (quoting *Reliance Ins. Co. v. Walker*, 33 N.C. App. 15, 18-19, 234 S.E.2d 206, 209 (1977)). A party has standing to initiate a lawsuit if he is a "real party in interest." *See Energy Investors Fund, L.P. v. Metric Constructors, Inc.*, 351 N.C. 331, 337, 525 S.E.2d 441, 445 (2000) (citing *Krauss v. Wayne County DSS*, 347 N.C. 371, 373, 493 S.E.2d 428, 430 (1997)). A motion to dismiss a party's claim for lack of standing is tantamount to a motion to dismiss for failure to state a claim upon which relief can be granted according to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. *See Street v. Smart Corp.*, 157 N.C. App. 303, 305, 578 S.E.2d 695, 698 (2003). An appellate court should review a trial court's order denying a motion for failure to state a claim "to determine 'whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory.'" *Hargrove v. Billings & Garrett, Inc.*, 137 N.C. App. 759, 760, 529 S.E.2d 693, 694 (2000) (quoting *Shell Island Homeowners Ass'n Inc.*

*v. Tomlinson*, 134 N.C. App. 217, 225, 517 S.E.2d 406, 413 (1999)).

We will now utilize this standard of review in determining whether the trial court properly dismissed Defendants' counterclaims.

## B. Defendants' Standing

According to the North Carolina Debt Collection Act, entities operating as "debt collectors" are prohibited from engaging in certain activities in the course of their work, such as using obscene, profane or abusive language, N.C. Gen. Stat. § 75-52(1); calling an individual at his or her place of employment in violation of an explicit instruction to the contrary, N.C. Gen. Stat. § 75-52(4); failing to disclose that the purpose of a particular communication is to collect a debt, N.C. Gen. Stat. § 75-54(2); erroneously describing the creditor's rights or intentions, N.C. Gen. Stat. § 75-54(4); falsely representing that the debtor may be required to pay attorneys' fees, N.C. Gen. Stat. § 75-54(6); and communicating with any consumer by means other than the transmission of an account statement after having been notified that the consumer is represented by counsel, N.C. Gen. Stat. § 75-55(3). However, "before a claim for unfair debt collection can be substantiated, three threshold determinations must be satisfied. First, the obligation owed must be a 'debt'; second, the one owing the

obligation must be a 'consumer'; and third, the one trying to collect the obligation must be a 'debt collector.'" *Reid v. Ayers*, 138 N.C. App. 261, 263, 531 S.E.2d 231, 233 (2000) (citing N.C. Gen. Stat. § 75-50(1)-(3)). According to the relevant statutory provisions, a "consumer" is "any natural person who has incurred a debt or alleged debt for personal, family, household or agricultural purposes," N.C. Gen. Stat. § 75-50(1), with a "debt" being "any obligation owed or due or alleged to be owed or due from a consumer." N.C. Gen. Stat. § 75-50(2). An individual or entity is "a debt collector" if he, she, or it "engag[es], directly or indirectly, in debt collection from a consumer." N.C. Gen. Stat. § 75-50(3). As a result, the ultimate issue raised by Defendants' challenge to the dismissal of their counterclaims is the meaning of the term "consumer" as used in N.C. Gen. Stat. § 75-50(1).

"Legislative intent controls the meaning of a statute; and in ascertaining this intent, a court must consider the act as a whole, weighing the language of the statute, its spirit, and that which the statute seeks to accomplish. The statute's words should be given their natural and ordinary meaning unless the context requires them to be construed differently." *Shelton v. Morehead Mem'l Hosp.*, 318 N.C. 76, 81-82, 347 S.E.2d 824, 828 (1986) (citations omitted). According to its plain language,

N.C. Gen. Stat. § 75-50(1) treats individuals who have incurred both actual and alleged debts as "consumers." When this reference to an "alleged debt" is considered in conjunction with the fact that N.C. Gen. Stat. § 75-50(2) includes both "obligation[s] owed or due or alleged to be owed or due from a consumer" within the statutory definition of a "debt," it is clear that the General Assembly contemplated that the protections available under the North Carolina Debt Collection Act would be available to both those who actually owed the debt that the debt collector was seeking to collect and those whom the debt collector claimed to owe the debt even if the debtor denied the existence of the underlying obligation. Any other interpretation of the relevant statutory language would have the absurd result of making the relevant statutory protections unavailable to those who had a viable defense to the underlying claim that the debt collector was seeking to enforce. As a result of the fact that Defendants sufficiently alleged that Plaintiff sought to collect the amount owed under the original contract between Marvin and Mertice Locklear and asserted that Defendants were liable for that obligation, we believe that Defendants sufficiently alleged that they were "consumers" for purposes of N.C. Gen. Stat. § 75-50(1).

In seeking to persuade us that Defendants do not fall within the category of "consumers" as defined in N.C. Gen. Stat. § 75-50(1), Plaintiffs argues that our decision in *Holloway v. Wachovia Bank & Trust Co., N.A.*, 109 N.C. App. 403, 428 S.E.2d 453 (1993), *aff'd in part, rev'd in part*, 339 N.C. 338, 452 S.E.2d 233 (1994), is controlling and required the trial court to dismiss Defendants' counterclaims. In *Holloway*, one of the plaintiffs obtained a loan, on which she later defaulted, for the purpose of purchasing a car. *Holloway*, 109 N.C. App. at 406, 428 S.E.2d at 455. According to the plaintiffs' complaint, an agent for the defendant pointed a firearm at the debtor and various members of her family during the repossession process. *Id.* at 406-07, 428 S.E.2d at 455. On appeal, this Court affirmed the trial court's decision to dismiss the claims that had been asserted based upon the pointing of a gun at members of the debtor's family on the grounds that, "[a]s this definition indicates, the legislative intent of the statute is to protect the consumer, not bystanders or those who happen to accompany the consumer at the time of an alleged [N.C. Gen. Stat.] Chapter 75, Article 2 violation." *Id.* at 413, 428 S.E.2d at 459. We do not, however, believe that our decision in *Holloway* has any bearing on the proper outcome of this case given our conclusion that Defendants were not mere bystanders. Instead of simply

standing around while Plaintiff engaged in efforts to collect a debt from a third party, Defendants were the direct targets of Plaintiff's activities. As a result, the trial court's decision to dismiss Defendant's counterclaims cannot be upheld on the basis of the logic set out in *Holloway*.

In addition, Plaintiff argues that, given the fact that we cited the decision of the United States District Court for the Middle District of North Carolina in *Fisher v. Eastern Air Lines, Inc.*, 517 F. Supp. 672 (M.D.N.C. 1981), in the course of discussing the definition of a "consumer" in *Holloway*, we are obligated to utilize the rationale employed in *Fisher* in deciding the validity of Defendants' challenge to the trial court's order in this case. In *Fisher*, the plaintiff sought relief for alleged violations of the North Carolina Debt Collection Act arising from the defendant's efforts to collect a debt from the plaintiff that was, in fact, owed by an individual with a name that was similar to the plaintiff's name. *Fisher*, 517 F. Supp. at 673. In holding that the plaintiff was not a "consumer" as defined in N.C. Gen. Stat. § 75-50(1), the court stated that, in order for an individual to be a "consumer," "he must have had at least some connection with the underlying debt or alleged debt" and that the statutory reference to an "alleged debt" did not encompass "an instance in which a debt collector

mistakenly identified the person who owed it money or allegedly owed it money" given the necessity that the "debt" or "alleged debt" be "incurred." *Id.* As a result, the *Fisher* court held that the relevant statutory language "does not evidence an intent by the legislature to provide protection for persons mistakenly thought to have been the one who incurred an obligation." *Id.*

We are simply unable to read *Fisher* as narrowly as Plaintiff does. As we read its decision, the *Fisher* court simply held that there must be some connection between the debt or alleged debt and the individual from whom recovery is sought. In light of that fact, a simple case of mistaken identity does not involve the sort of connection between the "consumer" and the "alleged debt" contemplated by the relevant statutory language. In this case, however, Defendants are in possession of the manufactured home that secured the original debt evidenced by the contract between Marvin and Mertice Locklear, on the one hand, and Ted Parker, on the other. As a result, even if we are bound by the logic utilized by the *Fisher* court, a subject about which we express no opinion, such a determination does not necessitate a decision to affirm the trial court's order.

After carefully reviewing the record, we believe that the facts present in this case closely resemble those underlying the decision of the United States District Court for the Eastern District of North Carolina in *Redmond v. Green Tree Servicing, LLC*, 941 F. Supp. 2d 694 (E.D.N.C. 2013), in which the debtor incurred a debt pursuant to a real estate financing agreement. *Redmond*, 941 F. Supp. 2d at 695. After the original debtor died, the property used to secure the debt was left to his wife, who rented the property to the plaintiffs. *Id.* Although the creditor knew that the plaintiffs possessed the property used to secure the original debt, it never entered into an agreement with the plaintiffs under which the plaintiffs were made liable for the underlying debt and never requested the plaintiffs to assume responsibility for paying the underlying debt. However, the defendant did attempt to collect the debt from the plaintiffs on numerous occasions. *Id.* at 695-96.

Although the defendant in *Redmond*, like Plaintiff here, argued that the plaintiffs were not "consumers" as that term is defined in N.C. Gen. Stat. § 75-50(1) on the grounds that they "did not actually incur the" debt, *id.* at 697, the court rejected that argument, reasoning that "the plain language of the statute references both *alleged* debts and *alleged* debtors" and stating that "[t]his language would be rendered superfluous

if the court imposed on plaintiffs an additional requirement that they demonstrate they themselves actually incurred the debt." *Id.* at 698. In response to the defendant's argument, in reliance upon *Fisher*, "that giving weight and meaning to the statute's use of 'alleged' would render the statute's use of 'incurred' superfluous," the *Redmond* court noted that "the plaintiff [in *Fisher*] did not have standing because the debt collector had attempted to collect from him on the basis of mistaken identity," while, in this case, "there [was] a strong connection between the plaintiffs and the underlying debt" and "the defendant actively worked to perpetuate the plaintiffs' impression that they were legally bound by the debt." *Id.* As a result, given the existence of "a strong connection between the plaintiffs and the underlying debt" and the fact that the debt collector "actively worked to perpetuate the plaintiffs' impression that they were legally bound by the debt," *id.*, the *Redmond* court allowed the plaintiff's claim to proceed. We find the approach utilized in *Redmond* persuasive.

In its brief, Plaintiff argues that *Redmond* is inapplicable to the present case because no one misled Defendants into believing that they owed a debt and because, on the contrary, everyone understood that the underlying debt was owed by Mertice Locklear's estate. However, the debt collector in *Redmond*, like

Plaintiff, made repeated contacts with Defendants in an attempt to collect the debt. *Id.* at 695. In addition, the defendant before the Court in *Redmond*, like Plaintiff here, threatened to lock the plaintiffs out of the home or have them evicted in the event that the plaintiffs did not make payments against the underlying obligation. *Id.* at 696. In addition, Plaintiff's agents identified themselves to Defendant Jimmie Locklear as "your" account manager, allowed Defendants to defer making monthly payments, and engaged in other actions that were tantamount to treating Defendants as if they were liable on the underlying debt. As a result, we are persuaded by the similarity between the actions taken by the debt collector at issue in *Redmond* and the actions taken by Plaintiff in this instance and conclude that Plaintiff acted in such a manner as "to perpetuate the plaintiffs' impression that they were legally bound by the debt," *id.* at 698, despite the fact that Defendants never officially assumed the original obligation undertaken by Marvin and Mertice Locklear.

In addition, the record reflects the existence of a strong connection between Defendants and the underlying debt. The only connection between the *Redmond* plaintiffs and the underlying debt was the fact that the plaintiffs were living on the property used to secure the underlying debt. *Id.* at 695.

Similarly, in this case, Defendants resided in the property that secured the underlying debt. In addition, Defendant Jimmie Locklear had an expectancy interest in the manufactured home by virtue of the residuary clause contained in Mertice Locklear's will. Although "mobile homes are considered personal property," *Patterson v. City of Gastonia*, __ N.C. App. __, __, 725 S.E.2d 82, 93, *disc. review denied*, 366 N.C. 406, 759 S.E.2d 82 (2012), and although "personal property, both legal and equitable, of a decedent shall be assets available for the discharge of debts and other claims against the decedent's estate," N.C. Gen. Stat. § 28A-15-1(a), N.C. Gen. Stat. § 28A-15-2(a) provides that, "[s]ubsequent to the death of the decedent and prior to the appointment and qualification of the personal representative or collector, the title and the right of possession of personal property of the decedent is vested in the decedent's heirs"; that, "upon the appointment and qualification of the personal representative or collector, the heirs shall be divested of such title and right of possession which shall be vested in the personal representative or collector relating back to the time of the decedent's death for purposes of administering the estate of the decedent"; and that, "if in the opinion of the personal representative, the personal representative's possession, custody and control of any item of personal property is not

necessary for purposes of administration, such possession, custody and control may be left with or surrendered to the heir or devisee presumptively entitled thereto." As a result of the fact that Defendant Jimmie Locklear was in possession of the manufactured home both before and after his appointment as collector of Mertice Locklear's estate in 2012 and the fact that, in the absence of a determination that the manufactured home needs to be sold in order to pay the debts of the estate, the property will pass to him under Mertice Locklear's will, Defendants clearly have a sufficiently "strong connection" to the property to afford them standing to maintain their claims under the North Carolina Debt Collection Act. As a result, based upon our reading of the relevant statutory language and the logic of *Redmond*, 941 F. Supp. 2d at 698 (holding that the Act "extend[s] to claims by individuals against whom a debt collector has made purposeful, targeted, and directed attempts to collect a debt alleged to be owed by the plaintiffs"), which we find to be persuasive, we hold that Defendants have alleged sufficient facts to establish their standing to maintain the claims that they have asserted against Plaintiff under the North Carolina Debt Collection Act.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that the trial court erred by concluding that Defendants lacked standing to maintain a claim based upon alleged violations of the North Carolina Debt Collection Act. As a result, the trial court's order should be, and hereby is, reversed and this case should be, and hereby is, remanded to the Robeson County Superior Court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Judges MCGEE and STEELMAN concur.